**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | **CASE NO.: 1:22-CR-56** |
| **Plaintiff,** | : | **JUDGE COLE** |
| **v.** | : | **<u>SENTENCING MEMORANDUM OF THE UNITED STATES</u>** |
| **LIMIN YE,** | : | |
| **Defendant.** | : | |

As a Federal Firearms Licensee, Limin Ye had a duty to engage in the business of selling firearms lawfully and responsibly. Instead, she disregarded the law and prioritized profits. Consequently, firearms Ye sold frequently ended up in the hands of felons and violent criminals. Her failure to correctly document the sale of illegally manufactured firearms also hampered law enforcement's ability to identify straw purchasers. The Guidelines call for a sentence of 70 to 72 months. The government recommends a sentence of 70 months, which is sufficient but not greater than necessary to reflect the seriousness of the offense, promote just punishment, and afford adequate deterrence.

## BACKGROUND

Limin Ye owned and operated Opticzoom, a Federal Firearm License (FFL) dealer. (PSR, ¶ 22.) She was the license holder for the Opticzoom FFL, which permitted her to engage in the business of buying and selling firearms for profit. (*Id.*) Opticzoom had a storefront, but it primarily operated at gun shows. Industry Operations Investigators with the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) went to Opticzoom on January 26, 2022, to conduct a compliance inspection. (*Id.* at ¶ 23.) At the time of the inspection, ATF investigators knew that firearms sold

by Opticzoom generated a large number of traces, meaning that the firearms sold by Opticzoom were frequently recovered in crimes.

During the January 26, 2022, inspection, the Industry Operations Investigator (IOI) found 71 lower receivers that Ye had illegally manufactured into firearms. (PSR, ¶ 23.) To engage in the business of manufacturing firearms, an individual must obtain a Type 07 FFL. (*Id.* at ¶ 22.) Ye never applied for and did not hold a Type 07 FFL. (*Id.*) Ye told the IOI that she built the firearms from lower receivers. (*Id.* at ¶ 23.) Of those 71 manufactured firearms, 32 were loaded onto a trailer, which investigators believed Ye intended to bring to a gun show that weekend. That day, the IOI told Ye she was not allowed to sell the manufactured firearms because it was unlawful to place manufactured firearms into commerce without a Type 07 FFL. (*Id.*) Ye didn't listen.

Three days later, undercover ATF agents attended the Dayton Gun Show where Ye was a vendor. (PSR, ¶ 24.) An undercover agent went to Ye's booth and saw that Ye displayed illegally manufactured firearms for sale. (*Id.*) Equipped with an audio/visual recording device, the undercover bought two AR pistols Ye illegally built. (*Id.*) During the sale, the undercover and Ye engaged in conversation about the AR pistol. Ye told the agent she built the AR pistols and when she sells built firearms, she sells them as a lower, meaning she will disposition the manufactured gun as a lower receiver. (*Id.*) She told the undercover that she is good at building firearms, she loves building firearms, and she builds firearms "too much." (*Id.*) Ye explained that ATF told her she wasn't allowed to build firearms. (*Id.*) Ye also told the undercover she has storefront in Cincinnati and "[m]ost of the people know me, so don't worry about it, everything is easy." (*Id.*)

After the undercover selected the two manufactured firearms s/he wished to purchase, Ye instructed a male employee to complete the required paperwork (an ATF Form 4473). (PSR, ¶ 26.)

On the Form 4473, the employee identified the two AR pistols as lower receivers. (*Id.*) The employee explained, "we build it in our shop so we still have to list it as a lower." (*Id.*)

After Ye sold two illegally manufactured firearms to the undercover, the undercover and a second undercover agent returned to the Ye booth. (PSR, ¶ 27.) The second undercover showed interest in buying two pistols but told Ye that s/he was from out of state and was not allowed to buy the firearms in Ohio. (*Id.*) The first undercover agent asked Ye if s/he could buy the pistol for the second undercover, and Ye said no, because it is a straw purchase, but the undercover could sell it to his/her friend the next day. (*Id.*) Ye then watched the second undercover give the first undercover money to purchase the pistol. (*Id.*) Ye then allowed the first undercover to buy the pistols. (*Id.*) In other words, Ye permitted the undercover agents to complete a straw purchase.

On February 2, 2022, Ye called the IOI and asked if ATF would punish her if she took the manufactured firearms apart. (PSR, ¶ 30.) The IOI again told Ye that she was not permitted to sell manufactured firearms without the appropriate license. (*Id.*) Three days later, undercover ATF agents went to the Columbus Gun Show to see whether Ye was unlawfully selling her manufactured guns. (*Id.*) The undercovers discovered that Ye had manufactured lower receivers for sale but had separated the lower receiver from the upper receiver and said both parts were for sale. Then she told the undercover agents how to put those two parts together, which was a very easy task. (*Id.*) Ye was still selling firearms she built.

On February 17, 2022, ATF agents executed a search warrant at Opticzoom. During the search, agents recovered 50 fully manufactured firearms. (PSR, ¶ 32.) Agents also seized 478 lower receivers, Ye's firearm sale records, and a short barrel rifle, which Ye possessed illegally because she did not have the required tax stamp.[1] (*Id.* at ¶¶ 32, 35.)

[1] Federal law makes it unlawful to possess certain types of firearms, such as a rifle with a barrel of less than 16 inches, if those firearms are unregistered.

From paperwork recovered during the search warrant, ATF identified a representative sample of individuals who purchased manufactured firearms from Ye. More specifically, ATF reviewed 4473 paperwork for the sale of lower receivers and interviewed the purchasers to determine whether the individual purchased a lower receiver or a manufactured firearm. During interviews, ATF learned that Ye engaged in the business of manufacturing firearms without a license since at least April 2021 and sold manufactured firearms to customers on at least nine occasions from April 2021 through December 2021.[2] (PSR, ¶ 29.)

Ultimately, Ye pled to two counts in an Information charging her with engaging in the business of manufacturing firearms without a license in violation of 18 U.S.C. § 922(a)(1)(A) and 923(a), and false entry in an FFL record in violation of 18 U.S.C. § 922(m). (R. 3, Plea Agreement.) The United States Probation Department prepared a Presentencing Investigation Report, to which there are outstanding objections, and the matter is scheduled for sentencing on March 28, 2022.

## **LEGAL STANDARD**

The Sentencing Guidelines "should be the starting point and the initial benchmark for choosing a defendant's sentence." *United States v. Demma*, 948 F.3d 722, 727 (6th Cir. 2020) (internal quotations omitted). Accordingly, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *Gall v. United States*, 552 U.S. 38, 49 (2007).

Then, the Court is required to consider the sentencing factors outlined in 18 U.S.C. § 3553(a). These factors include the following:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;

[2] ATF agents did not interview all potential purchasers, only a sample. Therefore, the government does not know how many manufactured firearms Ye sold. The disposition of firearms as lower receivers concealed her activities.

> (2) the need for the sentence imposed--
>
> > (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> >
> > (B) to afford adequate deterrence to criminal conduct;
> >
> > (C) to protect the public from further crimes of the defendant; and
> >
> > (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;
>
> (4) . . . the sentencing range established . . . [by the Guidelines];
>
> (5) any pertinent policy statement . . . issued by the Sentencing Commission . . . that . . . is in effect on the day of sentencing[;]
>
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
>
> (7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

The Court should impose a sentence sufficient but not greater than necessary to reflect the purposes of sentencing that Congress identified in 18 U.S.C. § 3553(a)(2). *See* 18 U.S.C. § 3553(a).

## ARGUMENT

### A. Sentencing Guidelines Calculation

The United States agrees with the Guidelines range calculated in the PSR, which gives a Guidelines imprisonment range of 70 to 72 months, based on a total offense level 27 and criminal history category I. Ye, however, objects to the Guidelines calculation in the PSR. She challenges the base offense level, the 10-level increase for the number of firearms possessed, and the application of the leader/organizer enhancement.

1. Offense Level and Criminal History Computation

Ye was convicted of two counts. Because the offense level is determined largely on the total amount of harm or loss, or some other measure of aggregate harm, the counts are grouped under U.S.S.G. § 3D1.2(d). (PSR, ¶¶ 43-45.)

The PSR assigns a base offense level of 18 under U.S.S.G. § 2K2.1(a)(5) because the offense involved a firearm described in 26 U.S.C. § 5845, here, the short barrel rifle. (PSR, ¶ 46.) Ten levels are added under § 2K2.1(b)(1) because the offense involved 200 or more firearms. (*Id.* at ¶¶ 48-49.) Ye's offense level is increased by two more points under U.S.S.G. § 3B1.1(c) because she was an organizer, leader, manager, or supervisor in any criminal activity. (*Id.* at ¶¶ 51-52.) She receives a three-point reduction for acceptance of responsibility, resulting in a total offense level of 27. (*Id.* at ¶¶ 56-58.) Ye has no criminal history and falls into criminal history category I. (*Id.* at ¶ 63.) The resulting Guidelines imprisonment range is 70 to 87 months. (*Id.* at ¶ 102.) However, the maximum term of imprisonment she faces for the two counts of conviction is 72 months. Therefore, her Guidelines range is 70 to 72 months. (*Id.*)

2. Ye's Objections

Ye lodged three objections to the PSR's Guidelines calculation. She objects to her base offense level, the number of firearms used to determine her specific offense characteristics, and the application of the leadership enhancement. The Court should overrule Ye's objections and adopt the PSR's sentencing Guidelines calculation.

*a. Relevant Conduct*

Ye's objections under § 2K2.1 hinge the scope of relevant conduct in this case. If the Court finds that Ye's possession of a short barrel rifle is relevant conduct under the Guidelines, then the PSR correctly calculated Ye's base offense level. Likewise, if the Court determines that the offense

involved the possession 200 or more firearms, then the PSR correctly increased Ye's offense level by 10. Because Ye's relevant conduct includes both, her objections should be overruled.

United States Sentencing Guideline (U.S.S.G.) § 1B1.3, Relevant Conduct (Factors that Determine the Guideline Range), provides the framework for calculating the base offense level, specific offense characteristics, cross references, and Chapter Three adjustments. U.S.S.G. § 1B1.3 instructs that relevant conduct shall be determined on the basis of the following relevant[3] criteria:

- all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense;
- where offenses are of a character where U.S.S.G. § 3D1.2(d) requires grouping of multiple counts, all acts and omissions described above that were part of the same course of conduct or scheme or plan as the offense of conviction[4];
- all harm that resulted from the acts and omissions described above; and
- any other information specified in the applicable guideline.

U.S.S.G. § 1B1.3.

The commentary instructs that "for two or more offenses to constitute part of a common scheme or plan, they must be substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar *modus operandi*." U.S.S.G. § 1B1.3 cmt. n.5(B)(i). "Offenses that do not qualify as part of a common scheme or plan may nonetheless qualify as part of the same course of conduct if they are sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses." U.S.S.G. § 1B1.3 cmt. n.5(b)(ii).

[3] U.S.S.G. § 1B1.3 also outlines relevant conduct in the context of a jointly undertaken criminal activity, which does not apply in this case.
[4] Importantly, multiple counts of conviction are not required for this subsection to apply. U.S.S.G. § 1B1.3 cmt. n.5(A).

Turning first to Ye's objection to her base offense level, the PSR correctly calculated the base offense level because Ye's unlawful possession of a short barrel rifle is sufficiently connected and related to her offense. Ye possessed the unregistered short barrel rifle at her Opticzoom store; it was recovered during the search warrant. Notably, her possession of the short barrel rifle was unlawful because the firearm was unregistered as required by the National Firearms Act. Ye's unlawful possession of the short barrel rifle is sufficiently connected to her unlawful manufacturing of firearms because both involve Ye exceeding the scope of lawful activities permitted by her Type 01 FFL. She possessed the short barrel rifle at the same location where she unlawfully manufactured firearms, and both are part and parcel of her ongoing disregard of her responsibilities as an FFL holder. The Court should overrule Ye's objection and adopt the PSR's conclusion that Ye's base offense level is 18.

Next, Ye objects to the PSR's application of U.S.S.G. § 2K2.1(b)(1). She argues that the offense did not involve 200 or more firearms because only 50 manufactured firearms were recovered in this case. Because Ye's relevant conduct includes firearms that are within the same course of conduct or common scheme or plan, the PSR's assessment is correct and Ye's objection should be overruled.

"When a court determines the number of firearms involved in an offense under U.S.S.G. § 2K2.1(b)(1), it looks to the relevant conduct section of the guidelines (U.S.S.G. § 1B1.3(a)(2)) to determine how many firearms come within the same course of conduct or perhaps a common scheme or plan." *United States v. Santoro*, 159 F.3d 318, 321 (7th Cir. 1998), *quoted in United States v. Kish*, 424 F. App'x 398, 408 (6th Cir. 2011). Here, Ye's relevant conduct includes the

lower receivers[5] because her possession of the receivers was central to her sale of illegally manufactured guns; receivers are an essential component to Ye's firearms manufacturing.

The commentary to U.S.S.G. § 2K2.1(b)(1) states that for purposes of calculating the number of firearms under § 2K2.1(b)(1), only firearms that were unlawfully sought to be obtained, unlawfully possessed, or unlawfully distributed are counted. U.S.S.G. § 2K2.1(b)(1) cmt. 5. Ye attempts to seek refuge in this commentary, arguing that the lower receivers should not be counted because they were legally obtained and possessed by her and her business. However, her argument misses the mark. Because Ye's intended to build those lower receivers into firearms and place those unlawfully manufactured firearms into commerce, the receivers at issue should be counted under § 2K2.1(b)(1).

The Sixth Circuit has addressed the scope of U.S.S.G. § 2K2.1(b)(1) in the context of dealing in firearms without a license. *United States v. Kish*. 424 F. App'x 398 (6th Cir. 2011). In *Kish*, the defendant was convicted of unlawfully engaging in the business of selling firearms without a license. *Id.* at 405. At sentencing, the district court concluded that the offense involved the possession of more than 200 firearms and increased the defendant's offense level by 10 points under § 2K2.1(b)(1). *Id.* at 407-408. The Sixth Circuit noted that "very few cases have dealt with the meaning of § 2K2.1(b)(1) in the context of unlawful possession of firearms by individuals found to be dealing in firearms without a license." *Id.* at 408. Ultimately, the court upheld the application §2K2.1(b)(1) and included the number of firearms the defendant sold and intended to sell; it was unlawful for the defendant to sell the firearms and make the firearms available for sale. *Id.* at 409; *see also United States v. Crudgington*, 469 F. App'x 823, 825 (11th Cir. 2012) (enhancement for 100 firearms under § 2K2.1(b)(1) upheld where the firearms not yet sold were

[5] Under federal law which the Guidelines use for the definition of "firearm," lower receivers are firearms. *See* 18 U.S.C. § 921(a)(3).

directly linked to the defendant's unlawful business). Like in *Kish*, the court should not limit Ye's relevant conduct to unlawfully manufactured firearms that she actually sold.

The issue then is whether Ye intended to manufacture the lower receivers into completed firearms and then sell them. The preponderance of the evidence suggests that she did. The evidence shows that Ye purchased lower receivers in bulk and used those lower receivers to build firearms. She told the undercover agent she builds "too much"; she is good at building firearms, even with her eyes closed; she can build a firearm in 12 minutes; and that she will build a firearm for free if the customer buys all the parts. The evidence further shows that Ye regularly sold illegally manufactured firearms at gun shows and falsely dispositioned those firearms as lower receivers on the 4473 paperwork. Ye's possessed more than 200 lower receivers (which qualify as firearms) with the intent to manufacture firearms and place those manufactured firearms into commerce. The PSR correctly applied U.S.S.G. § 2K2.1(b)(1).

*b. Leadership Enhancement*

The PSR gives Ye a 2-point adjustment under U.S.S.G. 3B1.1(c) because Ye was an organizer, leader, manager, or supervisor in any criminal activity. (PSR, ¶¶ 51-52.) She objects to the application of this enhancement and claims there is no evidence in the record to support its application. She is mistaken.

Ye was the owner of Opticzoom and the license holder of Opticzoom FFL. (PSR, ¶ 22.) At the Dayton Gun show, a male employee was working the Limin Sports booth with Ye. The undercover buy video clearly shows that Ye is the leader of the operation. She communicates with the undercover, she makes the sale, then she has her employee deal with the paperwork. Ye told the undercover that when she sells the manufactured gun, she sells it "as a lower [receiver.]" Then, she had the male help fill out the 4473 paperwork, which sold the gun as a lower receiver.

**B. Analysis of the 18 U.S.C. § 3553(a) Factors**

The Court must fashion a sentence that is sufficient but not greater than necessary to comply with the purposes set forth in 18 U.S.C. § 3553(a)(2). Hence, the Court's sentence must reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, and provide adequate deterrence to criminal conduct. The Court's sentence should also protect the public from future crimes by the defendant and provide the defendant with any needed educational or vocational training, medical care, or other correctional treatment.[6] Analysis of the § 3553(a) factors shows that the government's recommended sentence is the appropriate sentence in this case.

At first blush, Ye's criminal conduct may seem minor or appear to merely run afoul of ATF's regulatory scheme. In reality, Ye's complete disregard of the law directly contributed to the proliferation of criminal firearm possession, which in turn feeds this country's violent crime epidemic. The seriousness of the offense cannot be understated.

To be sure, Ye manufactured firearms to bolster profits and she should have obtained the required Type 07 FFL. That conduct is unlawful and indeed serious. However, Ye's efforts to conceal her manufacturing business and her willingness to entertain straw purchases set this case apart because those actions hamper the government's ability to investigate and prevent gun violence.

ATF does a lot of things to combat gun violence. For instance, ATF investigates offenders directly involved in violent crime and violent felons who habitually carry firearms. like those that brandish guns when robbing stores or dealing drugs. ATF also identifies and investigates those

[6] The government recognizes that the need to protect the public from future crimes by the defendant is diminished because the defendant's FFL was revoked. Similarly, the government has not identified from the PSR any needed educational or vocational training or treatment.

responsible for putting guns in the hands of people who are not allowed to buy or possess them. To do this, ATF frequently uses multiple sale reports to identify firearms traffickers and straw purchasers. A multiple sale report is generated when an individual purchases from an FFL more than one firearm in a single transaction. If a person buys several firearms in a single transaction or frequently buys firearms on multiple different occasions, that behavior may be indicative of firearms trafficking. The sale of multiple lower receivers in a single transaction does not generate multiple sale reports.

The way Ye dispositioned her illegally manufactured firearms on ATF paperwork is important in the context of multiple sale reports. For example, although the undercover purchased two AR pistols, those pistols were dispositioned as lower receivers. As a result, that sale would not generate a multiple sale report. Thus, if any person purchased multiple manufactured firearms from Ye or made several purchases involving multiple manufactured firearms, ATF would not receive information necessary to follow-up and investigate potential firearms trafficking activity. Accordingly, while Ye was concealing her own criminal behavior through false statements on paperwork, she was also hampering any future investigations into firearms traffickers and straw purchasers that elected to buy guns Ye built unlawfully.

Ye also showed callousness towards straw purchasing. After she sold her illegally manufactured guns to the first undercover, she intentionally turned a blind eye to the subsequent straw purchase with the second undercover. She even told the first undercover s/he could sell the firearm to the second undercover the very next day., which is classic straw purchasing behavior. Her disregard for the law surrounding straw purchasing explains why firearms she sold are recovered as crime guns at an alarming rate. In 2020 and 2021, 273 crime guns traced to Opticzoom. In other words, about every third day, a newly recovered crime gun traces back to

Opticzoom. This is not a mere coincidence, it's a correlation. Traces to other FFLs pale in comparison to Opticzoom.

Ye knew she was not allowed to sell the firearms she built, but she did it anyways. In the undercover videos, Ye bragged about building firearms, even though ATF told her it was illegal. She laughed and she joked. Then she allowed undercovers to make a straw purchase. Ye knew the law but she didn't care. She did not care if her guns ended up with felons or were used in violent crimes. She only cared about profits. In her own words, "[m]ost of the people know me, so don't worry about it, everything is easy." Buying a firearm from Ye was easy and everyone knew it.

We expect those entrusted with licenses to engage in the business of dealing in firearms to follow the rules and obey the law. That responsibility is so important because FFLs are the first line of defense against felons, domestic abusers, and violent criminals trying to obtain firearms. Ye shirked her responsibilities and flagrantly disregarded the law. For that reason, it is important that Ye's sentence reflect the seriousness of her offense, promote respect for the law, and deter others from engaging similar conduct. The government's recommended sentence falls at the bottom of the Guidelines range and a Guidelines sentence is appropriate under the 18 U.S.C. § 3553(a) factors.

## CONCLUSION

For the foregoing reasons, the United States asks the Court to sentence Ye to an aggregate term of imprisonment of 70 months, followed by three years of supervised release, a fine, and a mandatory $100 special assessment.[7]

Respectfully Submitted,

KENNETH L. PARKER
UNITED STATES ATTORNEY

*/s/Ashley N. Brucato*

ASHLEY N. BRUCATO (0090989)
Assistant United States Attorney
221 East Fourth Street, Suite 400
Cincinnati, Ohio 45202
Phone: (513) 684-3711
Fax: (513) 684-6385
Ashley.Brucato@usdoj.gov

[7] The government recommends that Ye be sentenced to 60 months on Count 1 and 10 months on Count 2 to run consecutive to each other.